IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 22, 2025 Session

## STATE OF TENNESSEE v. AARON JOSEPH VAN ARSDALE

**Appeal from the Circuit Court for Maury County**
**No. 29901    Russell Parkes, Judge**

_____

### No. M2024-00338-CCA-R3-CD

_____

Defendant, Aaron Joseph Van Arsdale, appeals his Maury County convictions for vehicular assault, driving under the influence (second offense), simple possession of cocaine, and failure to exercise due care. He contends that: (1) the trial court erred in denying his motion to suppress the results of blood alcohol concentration testing; (2) the evidence is insufficient to support his conviction for vehicular assault; and (3) the trial court erred in ordering restitution. Upon review, we affirm Defendant's convictions, affirm the restitution order in part, vacate the restitution order in part, and remand for entry of an amended judgment consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed in Part; Vacated in Part; and Remanded**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and TIMOTHY L. EASTER, JJ., joined.

Charles G. Blackard, III, and Cayley J. Turin, Franklin, Tennessee, for the appellant, Aaron Joseph Van Arsdale.

Jonathan Skrmetti, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Brent Cooper, District Attorney General; and Victoria Haywood, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## I. Factual and Procedural History

In August 2022, the Maury County Grand Jury issued an indictment charging Defendant with vehicular assault by intoxication, driving under the influence of an intoxicant (DUI), possession of more than .5 grams of cocaine for resale, violation of the helmet law, and failure to exercise due care. The indictment also charged that Defendant had a prior conviction for DUI that would serve to enhance his conviction for vehicular assault and DUI.

On March 7, 2023, Defendant filed a motion to suppress the results of blood alcohol testing, asserting that because of a delay in obtaining Defendant's blood sample, the sample was not consistent with his "blood alcohol content level . . . and/or drug levels at time of accident" and was, therefore, subject to suppression. Following a hearing, the trial court denied the motion on August 7, 2023. On September 28, 2023, Defendant filed a second motion to suppress the results of blood alcohol testing, again citing the delay in obtaining Defendant's blood sample. From the record, it does not appear that Defendant sought a hearing on the second motion to suppress but, instead, raised the issue in the middle of trial prior to testimony about the results of the blood alcohol testing. The trial court summarily denied the motion at that time.

Defendant's trial commenced on November 27, 2023. Theresa Mascolo testified that, on the evening of June 5, 2021, she went to a bar in Spring Hill called Froggy and Jeffro's with some friends. Ms. Mascolo estimated that she arrived at the bar around 6:30 p.m. and left between 11:30 p.m. and midnight. She said that, over the course of the evening, she had "at most" four Coors Light beers. She said that she had also eaten dinner at the bar.

Ms. Mascolo testified that she met Defendant at the bar for the first time that night. She explained that her friend, Monica, was the designated driver and was supposed to give her a ride home that night. Around 9:00 p.m., Monica left the bar because she got into an argument with her boyfriend; she told Ms. Mascolo that she was going to come back to the bar, but she never returned. Ms. Mascolo said that Defendant offered to take her home but that she initially declined because she knew he was on a motorcycle, and she did not want to ride a motorcycle "all of the way to Franklin." She testified, "And the only reason I knew that is because earlier in the night, . . . I was going to the bar to get everybody a beer, and I asked [Defendant] if he wanted one. And he said no, he was not drinking because he was on his motorcycle." Ms. Mascolo stated that she never saw Defendant drinking that night, that Defendant told her his car was "a few miles" away, and that he said he would take her the rest of the way home in his car.

Ms. Mascolo testified that Defendant gave her his helmet to wear before she got on the motorcycle. She explained that she got on behind Defendant and that because she was short, she could not see around Defendant to the front of the motorcycle. She testified, "I was holding onto him, but . . . I was just being careful not to lean to see because I didn't want to upset the balance of the bike." She said that Defendant was not speeding; she testified, "[W]e were going down the road, and the next thing I knew, I was kind of kneeling in some overgrowth." Ms. Mascolo stated that it was dark and that she did not know "exactly where [she] was." She recalled that she realized that she had been thrown off the motorcycle but that she did not know how far she was thrown from the roadway and "wasn't sure what happened." Ms. Mascolo knew that she was hurt badly and bleeding profusely. She said that Defendant "wasn't anywhere around" and that she called for him. She testified, "I realized that he was near the street trying to start his motorcycle to leave. And I was calling for him to come help me, and he was trying to leave me."

Ms. Mascolo explained that she pulled her cell phone out of her crossbody purse and called 911. She testified, "I remember my call with 911 . . . they said to me, who is with you? And . . . where is he? And I said, he's on his motorcycle trying to leave me." She said that she did not know how long she waited for the ambulance but that Defendant "did finally come over and wrap something around my neck because he couldn't get his motorcycle started." She stated that she had a stick "impaled in the back of [her] neck" and a cut down the side of her head but that she never lost consciousness.

Ms. Mascolo recalled being taken to the hospital via ambulance. She said that she was in the hospital trauma unit for three-and-a-half weeks and then she went to a rehabilitation hospital. Regarding her injuries, Ms. Mascolo stated that she fractured a vertebra in her neck and several vertebrae in her back; she also fractured her scapula and right hip. She described her pain after the crash as "excruciating" and noted that she had "extreme rib pain" that affected her ability to breathe. Ms. Mascolo testified that she was not able to walk and was in a wheelchair for "almost seven weeks." She stated that she had two major surgeries on her back and that surgeons had to remove the stick from her neck, which left a "pretty big hole" in her neck. Ms. Mascolo stated, "I have had quite a few procedures on my back, injections, epidurals. I've had minimum two hundred and twenty doctors' appointments in the last two years -- two-and-a-half years. I am preparing for another surgery after the first of the year." She said that she had also attended physical therapy and emotional trauma therapy following the wreck. She explained that she continued to suffer "extreme back pain," that she could not walk or stand for long periods of time, and that she lost her job because she could no longer work as a personal trainer. She said that she had a scar on her neck and a scar running the "whole length" of her back.

Ms. Mascolo testified that, when she left the bar with Defendant, she did not know he was under the influence of alcohol. She said that she did nothing to cause the motorcycle

crash. She noted that she had been on the back of a motorcycle four or five times previously and that she had been a passenger on a neighbor's motorcycle a couple of weeks before the crash.

Daniel Thompson, a trooper with the Tennessee Highway Patrol and an expert in drug recognition and the horizontal gaze nystagmus (HGN) test, testified that, at 12:57 a.m. on June 5, 2021, he was dispatched to the scene of the wreck on Greens Mill Road in Maury County. Trooper Thompson testified that he arrived at the scene at 1:18 a.m. and that, when he arrived, a deputy with the Maury County Sheriff's Department was already on the scene. Trooper Thompson stated that an ambulance had already taken the victim from the scene and that the deputy reported "it could possibly be a fatal crash."

Trooper Thompson testified that he was a crash reconstructionist. When asked about the condition of the roadway where the wreck occurred, Trooper Thompson said that it was a "[s]harp curve to the right[.]" He testified that it appeared Defendant's motorcycle "ran off the left side of the roadway, and that's when the occupants c[a]me off the bike." He agreed that it appeared the road was curving right but that the motorcycle "kept going straight[.]" Trooper Thompson noted that the motorcycle had been moved prior to his arrival at the scene; he said that it was "standing up" approximately fifteen to twenty feet from the curve and was facing back toward the direction from which it came. He said that it was dark, the speed limit on the road was 45 miles per hour, and the road was dry and level.

Trooper Thompson's traffic crash report, which was entered as an exhibit, indicated that Defendant had failed to keep in the proper lane of travel and that the crash occurred when Defendant was negotiating a curve. Trooper Thompson noted that the motorcycle had crossed the center line and that it had run off the left side of the road and into a ditch. The report indicated that the motorcycle was towed due to vehicle "disabling damage."

Trooper Thompson explained that, as soon as he began speaking to Defendant, he could smell alcohol coming from Defendant. Trooper Thompson testified that Defendant had "[r]ed bloodshot and watery eyes." Defendant said that he had been coming from Froggy and Jeffro's bar and that Ms. Mascolo, whom he had met at the bar, had been on the back of his motorcycle at the time of the crash. When Trooper Thompson asked Defendant how much he had to drink, Defendant said that he had consumed "a few beers" about "[a]n hour or so prior to the crash."

Trooper Thompson testified that he asked Defendant to perform several field sobriety tasks and that Defendant was cooperative in the testing. Trooper Thompson recalled that he had Defendant perform the "horizontal gaze nystagmus, . . . nine-step, one-leg stand . . . finger-to-nose and Rhomberg." Regarding Defendant's performance on the

- 4 -

HGN, Trooper Thompson stated that Defendant performed "[p]oorly" on the test and that "all six clues was shown." He said that, in his training and experience, Defendant's performance on the test indicated that Defendant had a blood alcohol concentration (BAC) of .08 or more. Trooper Thompson testified that Defendant also performed poorly on the nine-step walk and turn task; he said that Defendant started too soon, raised his arms, missed heel to toe and some steps, and stepped off the line. Trooper Thompson stated that Defendant's performance on the test indicated that his BAC was .08 or more.

When asked about Defendant's performance on the one-leg stand, the following exchange occurred:

> A. Poorly on that one as well.
>
> Q. What can you tell us about that one?
>
> A. He's -- there's four clues total on that task. [Defendant] was swaying during the task, put his foot down, and . . . used his arms for balance.
>
> Q. And in your training and experience, what does that indicate?
>
> A. Two or more clues is .08 or more BAC.

Trooper Thompson noted that Defendant also performed poorly on the finger to nose and Rhomburg tests, showing signs of impairment during both tasks. He testified that, after the field sobriety tests, he read Defendant the implied consent form, and Defendant agreed to a blood draw at 1:44 a.m.; he then placed Defendant under arrest. Trooper Thompson stated that, during a search of Defendant incident to arrest, he found a tightly wrapped small bag that contained a white powdery substance, which he believed was cocaine.

Trooper Thompson said that he observed Defendant's blood draw at Maury Regional Hospital at 3:45 a.m. He explained that the delay had been due to his having to wait for a wrecker to remove the motorcycle from the scene and his requesting a search warrant for Defendant's blood. He stated that he obtained a search warrant prior to the blood draw "due to it possibly being a felony case, vehicular assault."

Special Agent Dawn Swiney, a forensic scientist employed at the Tennessee Bureau of Investigation (TBI) crime laboratory, testified as an expert in forensic toxicology. Agent Swiney stated that, as part of her work, she received and tested Defendant's blood sample. She said that Defendant's blood had a BAC of 0.135 grams at the time it was collected. Agent Swiney testified that at a 0.135 BAC:

[A] person would be considered impaired when it comes to driving. They can have an increase in reaction time and a decrease in critical judgement, which means that if they're driving down the road and a dog runs out in front of the car, it takes them longer to absorb the situation to realize that they need to do something. And then it takes them longer for their brain to tell their foot to put on the brake.

Agent Swiney's testimony continued in the following colloquy:

Q. And if there had been a lapse of time between, say, a crash and that blood sample being collected, is there a way to know approximately what that blood alcohol concentration would have been at the time of driving?

A. I can't say exactly what it would have been. It could have been lower than what I found. It could have been the same as what I found. Or it could have been higher than what I found. In order for it to be lower than what I found, that means that the person would still be absorbing the alcohol. So whenever an individual drinks, they will go through an absorption phase. They will reach a peak level, at which they're completely absorbed. And then they'll start eliminating the alcohol. So we call it absorption phase and elimination phase.

If they had just finished drinking right before the accident or the stop, they could have been lower than the .135 or the same as. And if they were in elimination, they could have been higher than.

Q. And if someone stated that they had stopped drinking an hour prior to driving, where would that put us, or where might it put us?

A. It takes approximately 30 minutes to an hour for absorption to be complete.

Q. So would we then be no longer climbing?

A. It's possible that they would have reached absorption -- or complete absorption and peaked.

. . . .

Q. So let's go ahead and assume that for right now that they are completely absorbed, they are in elimination. If it took almost three hours

- 6 -

between driving and the blood sample, could you do that math for us for those of us who aren't good at math?

A. Sure. So if it was three hours, you would multiply that by .01 to .02, and you would get .03 to .06 higher than what I found. If that were the case, it's possible they could have been a 0.165 to a 0.195.

TBI Special Agent John Scott, an expert in forensic chemistry, testified that he was employed in the drug identification section of the TBI crime laboratory. Agent Scott stated that he tested the white powdery substance found on Defendant at the time of his arrest and determined that the substance contained cocaine and weighed 0.76 grams.

TBI Special Agent April Bramlag, an expert in forensic toxicology, testified that she was working in the toxicology section of the crime lab when she tested Defendant's blood sample for drugs. Agent Bramlag said that her testing showed that Defendant's blood contained benzoylecgonine, an inactive metabolite of the drug cocaine. The following exchange then occurred:

Q. And if someone had taken [cocaine], let's say three hours prior to blood being taken, might they have the active cocaine in their system at that time to later have the metabolite?

A. So that depends on how much they took. So cocaine has a very rapid half-life. It only lasts sixty minutes.

. . . .

At the same time, when it's breaking down, it is creating this benzoylecgonine. So you'll see a rise in benzoylecgonine as cocaine goes down. Large dose of cocaine, I would expect that to potentially, three hours, still see some of it left over. So that depends how much was taken.

Regarding the effects of cocaine, Agent Bramlag stated:

Cocaine is a very strong stimulant. When an individual takes it, they feel the effects almost instantaneously to just a couple of seconds to a couple of minutes, depending on how they take it. There's an intense euphoria, and then the stimulant effect takes over, so agitation, aggression, inability to multitask, which is pretty important when you're operating your car. You're doing a lot of things at one time you've got to manage. They're going to

have a slowed reaction time where they cannot react to an event in a timely fashion.

After your body has been stimulated, you've essentially put it in this fight or flight kind of zone, it's going to crash. So I've been stimulated, and now my body is going to be tired. And now you're going to look like an individual that was under the influence of a depressant like alcohol. So they may be fatigued, very tired, lethargic. Again, inability to multitask because they're very exhausted and tired, slowed reaction time because they're slowed and lethargic to make a reaction.

When asked hypothetically if cocaine use could cause a person to miss a curve, Agent Bramlag responded, "They might have a slowed reaction to it. They might not be able to navigate that curve properly. They may overcorrect to the curve, potentially." She agreed that a person might not be able to react to the curve or to "perceive the time . . . when they're approaching that curve."

At the close of the State's proof, the trial court addressed its denial of Defendant's second motion to suppress. The court explained:

Counsel for [Defendant] did provide a written motion today . . . relative to that testimony. The [c]ourt had reviewed the court file. There was a scheduling order entered November the 9th, 2022. In that scheduling order -- and actually, that is a revised scheduling order that I signed, revising a previously entered scheduling order.

And it set a motion day for December the 9th of 2022. At that point, everyone would have had the information about the time of the accident, when the blood was taken, when the implied consent was given, which, specifically, was at 1:49 a.m., and when the sample was taken.

And thus, first, the [c]ourt finds that the motion today would be untimely and thus denies [the] same. Even if a reviewing [c]ourt finds that I am in error with regard to the timeliness, it appears that a similar motion was filed March the 7th of 2023. That motion styled motion to suppress blood sample evidence and dismiss vehicular assault charge and DUI charge.

And it specifically referenced the time lag between the taking of the blood sample and . . . the wreck and the taking of the blood sample. And it

appears that Judge Allen[1] heard that and entered an order August the 7th of 2023, denying the motion to suppress the blood.

And for those reasons, this [c]ourt finds that the motion to suppress, renewed motion to suppress, however you want to style it . . . should be denied.

Defendant elected not to testify. Following deliberations, the jury found Defendant guilty of vehicular assault, DUI, simple possession of cocaine, and failure to exercise due care. Defendant pled guilty to the violation of the helmet law charge, and he stipulated to his prior DUI conviction from April 2, 2018.

At a subsequent sentencing hearing, Defendant's presentence report was admitted as an exhibit without objection. In Ms. Mascolo's victim impact statement included within the presentence report, Ms. Mascolo indicated that her medical expenses totaled approximately $500,000, of which she had to pay "around $1,000." She stated that she had also incurred out-of-pocket expenses for counseling of approximately $2,500 at the time of the report. Ms. Mascolo noted that the incident had affected her ability to earn a living and that she had approximately $150,000 in lost wages from the date of the offense. When asked if she had incurred any other expenses as a result of the incident, she indicated that she had to pay approximately $28,000 in attorney's fees.

Ms. Mascolo testified that her life following the motorcycle crash had been a "nightmare." She stated, "This has affected me, my family, my children, my job, my income, my finances, my family life, my social life, and then there's the emotional trauma I am dealing with." She explained that, when she was thrown from the motorcycle, she landed fifty-three feet away. She testified that she had sustained numerous injuries, including a fractured vertebra, a broken left scapula, multiple facial fractures, rib fractures, a broken pelvis, a broken right femur, a torn labrum in her hip, and collapsed lungs. Ms. Mascolo indicated that she was in pain every day and that, due to her extensive injuries, she was unable to return to her job as a personal trainer. Ms. Mascolo said that her medical bills from June 2021 to December 2023 totaled $437,000, not including three additional trips to the emergency room. She said that her insurance had covered most of that total and that the hospital had forgiven what was left over because she had no income.

Ms. Mascolo testified that her lost wages, minus disability payments, totaled a bit more than $116,000. She said that she also paid out-of-pocket almost $3,000 for therapy and counseling. She explained that she was placed on disability and that her income was "a fraction of what [she] was making before." She testified, "I was making close to 60 a

---

[1] The Honorable David L. Allen retired on August 3, 2024.

year.  My disability is -- I've had it for a year.  That started a year ago in December, and it's right at $1[,]600 a month."  The following colloquy between the trial court and Ms. Mascolo then took place:

> THE COURT: And lost wages of *approximately* $116,000 based on $60,000 per year.  To the extent that the disability would be used as offset, that's 12 payments of [$]1[,]600.  Is that accurate?

> [MS. MASCOLO]: I actually think I received more than that, because I think -- I think I had a payment right before that the day that I filed for the nine months prior.  So there's --

> THE COURT: You get a lump sum --

> [MS. MASCOLO]: -- a lump sum and then -- yes.  That was in there as well.

> THE COURT: Do you know how much that was, or do you know when you made the application?  Maybe that would be the easiest way to do that.

> [MS. MASCOLO]: I do think it was -- that lump sum payment was for about nine months.

> THE COURT: I believe you have now received 12 [$]1[,]600-dollar payments.

> [MS. MASCOLO]: I've received 12 [$]1[,]600-dollar payments.  I have also received a lump sum when I started this, so nine months of $1[,]600.

> THE COURT: So 21 months?

> [MS. MASCOLO]: Right.

(Emphasis added).

On cross-examination, the following exchange occurred:

> Q. . . . and I just want to make sure I understand that you had stated you had $28,000 worth of outstanding attorney's fees.

A. When I got -- when I got my settlement, they took that much out of my settlement. As far as I'm concerned, that was $28,000 that . . . they took out of my settlement. That was it.

Q. That helps me, because that's what I was trying to figure out was what attorney you were paying. Did you ever file a civil suit for damages?

A. No.

Defendant testified that he was sorry for what had happened to Ms. Mascolo. He claimed that he had started his motorcycle and turned it around so that he could find his cell phone and call 911. He further claimed that he never would have left Ms. Mascolo.

Defendant said that his problems with alcohol began in 2019 after his divorce; he admitted, however, that he was previously convicted of DUI in 2018. Defendant asserted that he had not gone to a bar since the night of the crash, but he acknowledged that he still consumed alcohol on occasion, including after his conviction in the instant case. Defendant insisted that he no longer had a problem with drugs or alcohol but acknowledged that he had not sought treatment for substance abuse.

According to the presentence report, Defendant stated that he made "approximately $4,000 bi-weekly" and that his "only major debt" was his home mortgage; he stated that he would "be able to make minimum monthly payments . . . in the amount of $250 to go towards court costs, fine[s], and restitution should it be ordered." Defendant reported that he worked at Architectural Window Solutions as a project manager. Regarding his work, Defendant stated, "I provide materials for apartments on projects. We do lumber and interior trim."

At the conclusion of the hearing, the trial court sentenced Defendant, as a Range I standard offender, to concurrent sentences of three years and six months for vehicular assault (having a prior DUI conviction); 11 months and 29 days for DUI (second offense); 11 months and 29 days for simple possession of cocaine; 30 days for violation of helmet law; and 30 days for failure to exercise due care. The court merged the DUI conviction into the conviction for vehicular assault and ordered that Defendant serve his sentence in confinement.

The trial court further ordered that Defendant pay restitution to Ms. Mascolo in the amount of $119,100.00. In setting restitution, the court stated:

In compliance with Tennessee Code Annotated [section] 40-35-102, the [c]ourt makes specific findings relative to restitution. Lost wages are a specific form of pecuniary loss.

The victim testified to lost wages of $116,000. The [c]ourt finds that I would be -- that I should -- much like the applicable law that says restitution cannot be paid to an insurance company, because they are not the victim. The [c]ourt thus finds that the restitution as it relates to the lost wages be $116,400 and an initial $2,700 to the out-of-pocket expenses paid by the victim.

. . . .

Total restitution of $119, 100. I also have to make specific findings as to his ability to pay. There is nothing that anybody has put in this record about his ability to pay other than he makes $4,000 every two weeks.

He pockets $96,000 per year. I have no idea about the bond premium. That is for a different day. He may do what he so chooses.

I find based on the limited amount of information that I have about restitution and/or his ability to pay that he will pay the sum of $1,000 a month. Now, I also recognize that Subsection H of the statute specifically allows for the conversion of restitution into a civil judgment after the conclusion of probation.

Thereafter, Defendant filed a timely motion for new trial, which the trial court denied following a hearing. This timely appeal follows.

## II. Analysis

### *A. Motion to suppress*

Defendant contends that the trial court erred by denying his motion to suppress the results of blood alcohol testing. He asserts that the delay in drawing his blood was unreasonable; that there was "no excusable explanation nor reason for such a delay"; and that the delay prejudiced the accuracy of the testing. He claims that the blood alcohol draw was "too remote in time to prove . . . Defendant's actual BAC at the precise time" of the wreck. The State responds that Defendant waived his challenge to the trial court's suppression ruling by failing to include a transcript of the suppression hearing in the record and by failing to support the issue with citation to the record or with argument.

When a party seeks appellate review, he has a duty to prepare a record that conveys a complete account of what transpired as to the issues forming the basis of his appeal. *State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993). "When the record is incomplete, or does not contain the proceedings relevant to an issue, this [c]ourt is precluded from considering the issue." *State v. Miller*, 737 S.W.2d 556, 558 (Tenn. Crim. App. 1987). Likewise, "this [c]ourt must conclusively presume that the ruling of the trial court was correct in all particulars." *Id.* (citing *State v. Jones*, 623 S.W.2d 129, 131 (Tenn. Crim. App. 1981); *State v. Baron*, 659 S.W.2d 811, 815 (Tenn. Crim. App. 1983); *State v. Taylor*, 669 S.W.2d 694, 699 (Tenn. Crim. App. 1983)); *see State v. Ivy*, 868 S.W.2d 724, 728 (Tenn. Crim. App. 1993).

As noted by the State in its brief, the record in this case contains no transcript of the suppression hearing held by Judge Allen. Although Defendant filed a reply brief, he did not directly address the State's waiver argument, and he did not file a motion to supplement the record. Instead, Defendant appears to argue that because the record contains a transcript of the trial testimony, the record is sufficient for our review of this issue. We disagree. Typically, the issues at stake at a suppression hearing are different than the issues at stake at a subsequent trial. The State was not attempting to establish the admissibility of the results of the blood alcohol testing at Defendant's trial because the issue had already been ruled upon by the trial court. Because the evidence presented at the motion to suppress hearing is not available for this court to review, Defendant has failed to meet his burden of preparing an adequate appellate record. *See Ballard*, 855 S.W.2d at 560; *see also* Tenn. R. App. P. 24. Defendant has waived this issue, and we must presume the trial court acted correctly in denying the motion to suppress. *See Miller*, 737 S.W.2d at 558. Defendant is not entitled to relief.

## B. Sufficiency of the evidence

Defendant asserts that the evidence is insufficient to support his conviction for vehicular assault by intoxication.[2] Defendant does not contest that the evidence established his intoxication, the fact of the wreck, or the victim's serious bodily injury. He contends, however, that the evidence fails to demonstrate his intoxication caused the wreck, and thus the victim's injuries, because the State offered no direct evidence as to the cause of the wreck. The State responds that the evidence is sufficient to support his conviction for vehicular assault by intoxication.

---

[2] In the "Conclusion" section of Defendant's brief, Defendant indicates that he is also challenging his conviction for failure to exercise due care. However, Defendant failed to include this issue in his statement of the issues, and he did not brief the issue. As such, he has waived our consideration of the issue as it relates to that conviction. *See* Tenn. R. App. P. 27(a); Tenn. Ct. Crim. App. R. 10(b).

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Bland*, 958 S.W.2d at 659. Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). On appeal, the defendant bears the burden of proving why the evidence was insufficient to support the conviction, *Bland*, 958 S.W.2d at 659, and the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

Tennessee Code Annotated section 39-13-106 states:

> A person commits vehicular assault who, as the proximate result of the person's intoxication as set forth in § 55-10-401, recklessly causes serious bodily injury to another person by the operation of a motor vehicle. For the purposes of this section, "intoxication" includes alcohol intoxication as defined by § 55-10-408, drug intoxication, or both.

Tenn. Code Ann. § 39-13-106(a) (2020). As relevant here, Tennessee Code Annotated section 55-10-401 prohibits anyone from driving or being in physical control of a motor vehicle while:

> (1) Under the influence of any intoxicant, marijuana, controlled substance, controlled substance analogue, drug, substance affecting the central nervous system, or combination thereof that impairs the driver's ability to safely operate a motor vehicle by depriving the driver of the clearness of mind and control of oneself that the driver would otherwise possess"[.]

> (2) The alcohol concentration in the person's blood or breath is eight-hundredths of one percent (0.08%) or more[.]

Tenn. Code Ann. § 55-10-401(a)(1)-(2) (2021).

"[A] person acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of, but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint[.]

Tenn. Code Ann. § 39-11-106(34) (2021).

Defendant cites *State v. Whiteside*, No. W2018-01692-CCA-R3-CD, 2019 WL 3202919, at *5 (Tenn. Crim. App. July 16, 2019), *perm. app. denied* (Tenn. Dec. 11, 2019), in support of his argument that the evidence is insufficient. In *Whiteside*, this court found that the evidence presented was insufficient to support a conviction for failing to exercise due care because there was no proof that the defendant was speeding, which the court found to be an essential element of the due care clause in Tennessee Code Annotated section 55-8-136. *Id*. However, speeding is not an element of the offense of vehicular assault by intoxication, and the State was not required to prove that Defendant was speeding. Thus, *Whiteside* is not relevant to our analysis.

Viewing the evidence in the light most favorable to the State, the evidence is sufficient to sustain Defendant's conviction for vehicular assault by intoxication. The evidence reflects that the crash took place at a point where the road curved sharply to the right. Trooper Thompson testified that, despite the road being dry and level, Defendant's motorcycle "ran off the left side of the roadway," as though Defendant failed to detect the curve entirely, and Ms. Mascolo was thrown from the bike. The evidence further reflects that Defendant exhibited signs of intoxication at the scene. Defendant admitted to Trooper Thompson that he had consumed "a few beers" about "[a]n hour or so prior to the crash[,]" and his performance on field sobriety tests indicated to Trooper Thompson that Defendant's ability to drive was impaired. Additionally, experts testified that Defendant had a BAC of 0.135, and he had the presence of a cocaine metabolite in his blood—both indicators of a slowed reaction time of the sort that would cause a person to fail to execute the curve properly. Moreover, Ms. Mascolo testified that she did nothing to cause the wreck. The evidence established that the victim's injuries were the proximate result of Defendant's intoxication while operating a motor vehicle. Thus, the evidence is sufficient to support Defendant's conviction for vehicular assault by intoxication. Defendant is not entitled to relief.

*C. Restitution order*

Defendant contends that the trial court abused its discretion when ordering restitution to Ms. Mascolo. He argues that the ordered restitution was arbitrary because the trial court failed to: "give adequate reason or proof for setting specific restitution at $11[9],100.00"; consider that Ms. Mascolo had already received compensation for her injuries resulting from a "settlement of [a] civil nature"; establish a payment schedule; and consider Defendant's financial resources and his future ability to pay. The State responds that the trial court did not abuse its discretion when ordering restitution.

Appellate courts review all sentencing decisions, including the imposition of fines and restitution, under an abuse of discretion standard. *State v. Cavin*, 671 S.W.3d 520, 528 (Tenn. 2023); *State v. Gevedon*, 671 S.W.3d 537, 543 (Tenn. 2023); *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012); *see also State v. Bohanon*, No. M2012-02366-CCA-R3-CD, 2013 WL 5777254, at *5 (Tenn. Crim. App. Oct. 25, 2013). "A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence." *State v. McCaleb*, 582 S.W.3d 179, 186 (Tenn. 2019).

Trial courts possess the authority to order a sentence of continuous confinement in conjunction with restitution. Tenn. Code Ann. § 40-35-104(c)(2), (8) (2021); *State v. Jives-Nealy*, No. W2018-01921-CCA-R3-CD, 2020 WL 974201, at *23 (Tenn. Crim. App. Feb. 28, 2020), *perm. app. denied* (Tenn. Aug. 11, 2020). However, orders of restitution, including orders issued pursuant to section 40-35-104(c)(2), must follow the procedure outlined in Tennessee Code Annotated section 40-35-304. *See* Tenn. Code Ann. § 40-35-304(g) (2021); *Jives-Nealy*, 2020 WL 974201, at *23.

The version of Tennessee Code Annotated section 40-35-304[3] in effect at the time Defendant committed the offenses contains the following procedure relative to restitution:

> (b) Whenever the court believes that restitution may be proper . . . the court shall order the presentence service officer to include in the presentence report documentation regarding the nature and amount of the victim's pecuniary loss.

---

[3] As of January 1, 2022, Tennessee Code Annotated section 40-35-304 makes the consideration of a defendant's financial resources and ability to pay permissive rather than mandatory. Tenn. Code Ann. § 40-35-304(d) (Supp. 2022). However, because the offenses in the instant case occurred in 2021, the trial court was required to consider his ability to pay restitution. *See Gevedon*, 671 S.W.3d at 543-44 n. 6.

(c) The court shall specify at the time of the sentencing hearing the amount and time of payment or other restitution to the victim and may permit payment or performance in installments.  The court may not establish a payment or performance schedule extending beyond the statutory maximum term of probation supervision that could have been imposed for the offense.

(d) In determining the amount and method of payment or other restitution, the court shall consider the financial resources and future ability of the defendant to pay or perform.

. . . .

(g) The procedure for a defendant sentenced to pay restitution pursuant to § 40-35-104(c)(2), or otherwise, shall be the same as is provided in this section with the following exceptions:

. . . .

(2) A defendant sentenced in whole or in part to the payment of restitution pursuant to § 40-35-104(c)(2), or otherwise, shall be responsible for the payment of the restitution until the expiration of the sentence imposed by the court, and any payment or performance schedule established by the court shall not extend beyond the expiration date[.]

Tenn. Code Ann. § 40-35-304(b)-(d), (g)(2) (2021).

Tennessee Code Annotated section 40-35-304(e) defines "pecuniary loss" as:

(1) All special damages, but not general damages, as substantiated by evidence in the record or as agreed to by the defendant; and

(2) Reasonable out-of-pocket expenses incurred by the victim resulting from the filing of charges or cooperating in the investigation and prosecution of the offense; provided, that payment of special prosecutors shall not be considered an out-of-pocket expense.

Tenn. Code Ann. § 40-35-304(e) (2021).  Special damages are "'specifically claimed and proved' damages 'that are alleged to have been sustained in the circumstances of a particular wrong.'"  *Cavin*, 671 S.W.3d at 529 (quoting Black's Law Dictionary (11th ed. 2019)).  It is the State's burden to prove the victim's pecuniary loss. *Id*.

In this case, the trial court ordered that Defendant pay the victim restitution in the amount of $119,100, finding that Ms. Mascolo had lost wages totaling $116,400[4] and out-of-pocket expenses for counseling in the amount of $2,700. The trial court also established a payment schedule, ordering Defendant to pay $1,000 per month.[5] *See* Tenn. Code Ann. § 40-35-304(c).

As previously noted, under Tennessee Code Annotated section 40-35-304(d) in effect when Defendant committed the offenses, the trial court had to consider the financial resources and future ability of the defendant to pay or perform. *See* Tenn. Code Ann. § 40-35-304(d) (2021); *Gevedon,* 671 S.W.3d at 543-44; *see also State v. Johnson*, 968 S.W.2d 883, 886 (Tenn. Crim. App. 1997) ("In determining restitution, the trial court must consider what the defendant can reasonably pay given the appellant's means and future ability to pay."). In addressing this consideration, the trial court found that Defendant made "approximately $4,000 bi-weekly[,]" noting that Defendant "pockets" $96,000 per year. The trial court then ordered Defendant to pay $1,000 per month. The record supports the trial court's findings in this regard. We note, however, that with a sentence of three years and six months, Defendant will have only paid the victim $42,000 if he abides by the payment schedule set out by the court—far less than the full restitution amount ordered by the trial court. Although any amount of restitution that remains unpaid when the payment period expires may be converted into a civil judgment by the victim, *see* Tenn. Code Ann. § 40-35-304(h) (describing the procedure for conversion), "a trial court must enter a restitution order that can reasonably be paid by the defendant while under the trial court's jurisdiction, regardless of the possibility of later conversion to a civil judgment." *Cavin*, 671 S.W.3d at 530 (citing *Bohanon*, 2013 WL 5777254, at *6).

For these reasons, we affirm the portion of the trial court's restitution order requiring Defendant to pay the victim $1,000 per month over the course of his sentence for a total payment of $42,000. We vacate the $77,000 balance of the court's restitution order and remand to the trial court for the entry of an amended judgment of conviction reflecting that Defendant is ordered to pay the victim $42,000 at the rate of $1,000 per month.

---

[4] Ms. Mascolo reported lost wages of $150,000; she also testified that she had received twenty-one payments of $1,600 in disability payments, which would have totaled $33,600. In ordering restitution for lost wages in the amount of $116,400, it appears that the trial court offset Ms. Mascolo's lost wages by the total disability payments she received.

## III. Conclusion

Based upon the foregoing, we affirm Defendant's convictions, affirm the trial court's restitution order in part, vacate the restitution order in part, and remand for the entry of an amended judgment of conviction consistent with this opinion.


_s/Robert L. Holloway, Jr._
ROBERT L. HOLLOWAY, JR., JUDGE